**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CATHERINE VERSCHELDEN, | ) | |
| in her individual capacity and as | ) | |
| personal representative to the Estate | ) | |
| of Matthew Verschelden, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:19-CV-00167-DGK |
| | ) | |
| THE HARTFORD LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING SUMMARY JUDGMENT

This lawsuit arises from the denial of life-insurance benefits by Defendant The Hartford Life and Accident Insurance Company ("Hartford"). Plaintiff Catherine Verschelden alleges Hartford improperly refused to pay on her deceased husband's life-insurance policy (Doc. 36). Hartford responds that the life-insurance policy had lapsed, and, thus, it was under no obligation to pay (Doc. 32).

Now before the Court are the parties' cross motions for summary judgment.[1] As detailed below, a deferential abuse-of-discretion standard governs the Court's review and substantial evidence supports Hartford's decision. Therefore, the Court GRANTS Defendant's motion and DENIES Plaintiff's motion.

---

[1] Plaintiff also requested oral argument. Because oral argument was unnecessary to resolve the motions, the request is DENIED.

**Background**[2]

The life-insurance policy at issue belongs to Plaintiff's deceased husband, Matthew Verschelden ("Verschelden") and is now before the Court pursuant to 20 U.S.C. § 1132. Verschelden worked for the law firm of Stinson Leonard Street LLP, now Stinson LLP, for over thirty years, and left the firm as a Partner in 2015 due to complications from cancer. As a firm employee, Verschelden enrolled in Hartford's basic and supplemental group life insurance policies (collectively, "the Policy"), which Hartford both insures and administers. Verschelden was eligible for basic life insurance in the amount of $1,000,000 and supplemental life insurance in the amount of $180,000. The Policy required Verschelden to pay premiums while employed.

The Policy also included a Life Insurance Waiver of Premium provision ("the LWOP provision"). The LWOP provision continues life-insurance coverage without the payment of premiums if the insured meets its definition of "Disabled." The LWOP provision defines "Disabled" as:

> Disabled means You are prevented by injury or sickness from
> performing the material and substantial duties of any occupation for
> which You are, or could become, qualified by:
> 1)      education;
> 2)      training; or
> 3)      experience.
> In addition, You will be considered Disabled if You have been
> diagnosed with a life expectancy of 12 months or less.

(Doc. 30-1 at 58).[3] Furthermore, the Policy states Hartford has the right to "require Proof of Loss that You are Disabled . . . ." *Id.* Both the LWOP provision and the Policy are silent as to whether

---

[2] This section omits facts properly controverted by the parties, immaterial facts, facts not properly supported by admissible evidence, legal conclusions, and argument presented as fact. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a).

[3] Hereinafter, when capitalized, the term "Disabled" specifically refers to the definition outlined in the LWOP provision of the Policy.

2

"any occupation" includes part-time work.

In 2003, Verschelden was diagnosed with brain cancer and underwent treatment. Despite his diagnosis and treatment, Verschelden continued to work. From 2008 until 2014, Verschelden was clinically asymptomatic. However, in 2015, an MRI revealed the presence of bone cancer in his skull. Complications from this cancer forced him to stop working on August 21, 2015, and he never returned to work at the law firm. On August 27, 2015, Verschelden underwent surgery on his brain tumor.

On February 5, 2016, Hartford approved Verschelden's claim for waiver of premiums under the LWOP provision, finding he met the definition of Disabled. Hartford based its decision at least in part on information received from Sarah Taylor, M.D., Verschelden's treating oncologist, who opined that Verschelden was not able to perform sedentary work on a part-time basis from August 22, 2015, to February 22, 2016. Hartford's approval letter reminded Verschelden the waiver would only be effective "while You remain Disabled" and that Hartford would periodically request updated medical information to verify his continued disability (Doc. 30-6 at 21).

Throughout 2016, Verschelden continued to undergo treatment relating to pain, fatigue, numbness, seizures, and post-chemotherapy treatments.[4] That same year, however, Dr. Taylor observed his condition appeared to be improving. She described Verschelden as capable of carrying on "all pre-disease performance without restriction" and "[c]linically doing well" (Doc. 31-5 at 80, 87; dated March 30, 2017). She also found he could carry out "work of a light or sedentary nature, e.g., light house work, office work." *Id.*

---

[4] The "Analysis" section of this Order discusses specific medical findings in more detail.

Hartford contacted Dr. Taylor on July 13, 2017, for updated information. Dr. Taylor confirmed Verschelden could sit, stand, and walk for three hours at a time each, and that he had no cognitive impairments. She also agreed with her prior assessment that he could "occasionally bend, kneel, crouch and drive, lift up to 10 lbs. occasionally. Reaching/fingering and handling frequently" (Doc. 31-2 at 153–54).

Based in part on these evaluations, on July 24, 2017, Hartford terminated Verschelden's LWOP provision benefits, claiming he no longer met the definition of disabled based on his medical records (Doc. 30-5 at 79). Hartford did not conduct a vocational evaluation prior to terminating these benefits.

Upon termination, Hartford sent a letter to Verschelden informing him of his option to exercise his "Conversion Right" and convert the Policy to an individual plan (Doc. 30-5 at 77–79). Although he called Hartford and received additional information on the Conversion Right, Verschelden did not convert his Policy.

In December 2017, oncologist Benjamin Powers, M.D., diagnosed the return of Verschelden's cancer and determined that he needed surgery on two new nodules appearing on his brain. At that same appointment, Dr. Powers found Verschelden could never bend at the waist; perform fine or gross manipulation, including fingering, keyboard, grip/grasp, or handle; lift any weight; and could only occasionally drive or reach (Doc. 31-2 at 115, summarizing the assessment of Dr. Powers). Dr. Powers noted he expected Verschelden's restrictions and limitations to be "Permanent." *Id.*

On January 22, 2018,—the day before his brain surgery—Verschelden appealed Hartford's decision to terminate his LWOP provision benefits. In support of his appeal, he included exhibits containing information from both before and after the termination date. He claimed Hartford's

4

decision was incorrect because he was no longer able to work as a partner at a law firm, nor was he employable on a part-time basis because "there is no evidence that an employer would offer a person like me part-time employment" (Doc. 31-2 at 85–86). He asserted Hartford "cherry-picked information" from two of Dr. Taylor's reports (Doc. 36 at 18), and he stressed that the "possible recurrence" of his cancer and his scheduled "upcoming surgery . . . reaffirm the serious nature of this cancer" (Doc. 31-2 at 87). He also argued that the functionality evaluated—including the ability to sit, stand, and walk—were not relevant to evaluating the impact of brain cancer on his ability to work. He did not argue in his appeal that he lacked the ability to perform the functions which led to his termination.

On January 23, 2018, Verschelden underwent surgery, which confirmed the recurrence of his brain cancer. He wrote Hartford two weeks later to inform it that (1) his cancer had recurred; (2) surgery and radiation had been ruled out as options; and (3) chemotherapy would only extend his life, not cure his cancer.

On February 14, 2018, Hartford conducted a vocational evaluation, or employability analysis report ("EAR"), considering Verschelden's ability to work on a part-time basis. This EAR was based on Verschelden's "functional capabilities, education, training and work history" as supported by Dr. Taylor's evaluation (Doc. 31-1 at 12). The EAR found that Verschelden had the ability to perform five occupations on a part-time basis.

In April 2018, as part of the appeal, Hartford requested an independent review of Verschelden's file by Michael Snyder, M.D., a non-treating neurologist. The review was limited to Verschelden's functionality as of July 24, 2017, the date of termination, despite Hartford having requested all medical records—both before and after the termination date—that Verschelden cited in his appeal. Dr. Snyder determined Verschelden did not meet the Policy definition of Disabled,

5

but he imposed further limitations, including allowing only part-time work, and various other restrictions not initially contemplated in Verschelden's EAR. Based on Dr. Snyder's restrictions, Hartford requested an addendum to Verschelden's EAR. In this amended EAR, Hartford found that only four of the five identified positions could be performed on a part-time basis within the restricted functionality detailed by Dr. Snyder.

On May 11, 2018, Hartford sent Verschelden a letter denying his appeal, finding that he no longer met the Policy definition of Disabled because he could work on a part-time basis.

Verschelden died on October 6, 2018.

Plaintiff submitted a claim for death benefits with Hartford in December 2018. Hartford denied her claim on the basis that Verschelden's policy had lapsed prior to his death. Plaintiff appealed Hartford's determination, which it again denied in February 2019. Following that denial, Plaintiff filed suit in this Court. This suit is brought by Verschelden's spouse, the named beneficiary on the Plan, on her own behalf and on behalf of Verschelden's estate.

The parties do not dispute that Verschelden stopped making payments under the Policy. Thus, the narrow question before the Court is whether Verschelden was entitled to benefits under the LWOP provision. If so, then Hartford improperly terminated the policy.

**Standard**

A movant is entitled to summary judgment if she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court makes this determination by viewing the facts in the light most favorable to the nonmoving

party and drawing all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive summary judgment, the nonmoving party must "substantiate [her] allegation with sufficient probative evidence [that] would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (internal quotations and citations omitted).

**Analysis**

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, governs this Policy. Under ERISA, claimants may appeal an adverse-benefit decision and are guaranteed an appeals process that includes providing a full and fair review, an opportunity to submit written documents, and independence from the initial adverse decision. 29 C.F.R. § 2560.503-1(h).

ERISA also allows a plan beneficiary to seek judicial review of a plan administrator's denial of benefits. 29 U.S.C. § 1132(a)(1)(B). When a benefit plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," courts "must apply a deferential abuse-of-discretion standard of review." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011).

The abuse-of-discretion standard of review is highly deferential, and courts will refuse to override an administrator's decision unless it is determined to be "arbitrary and capricious." *Midgett v. Wash. Group Intern. Long Term Disability Plan*, 561 F.3d 887, 896 (8th Cir. 2009). A decision is not arbitrary and capricious if it is supported by substantial evidence. *Id*. at 896–97. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *River v. Edward D. Jones Co.*, 646 F.3d 1029, 1033 (8th Cir. 2011) (internal citations omitted). While the standard is deferential, the court's role is "not tantamount to rubber-stamping the result." *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).

**I.     A less deferential standard of review does not apply.**

Plaintiff urges this Court to adopt a less deferential standard of review for two reasons. First, Hartford was operating under a structural conflict of interest as both plan administrator (that is, the entity making eligibility determinations) and payor of benefits. Second, because, Plaintiff alleges, the decision involved egregious procedural irregularities.

**A.     Hartford's conflict of interest does not justify a heightened standard of review.**

There is no dispute that Hartford was operating under a conflict of interest as outlined in *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 108 (2008) (holding that the "dual role" of administrator determining benefit eligibility and payor of benefits "out of its own pockets . . . creates a conflict of interest"). The question is whether, in the context of the facts and circumstances in this case, that conflict justifies applying a heightened standard of review. *Glenn* requires courts to "analyze the facts of the case at issue, taking into consideration not only the conflict of interest, but also other factors that might bear on whether the administrator abused its discretion." *Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 775 (8th Cir. 2009) (applying *Glenn* to a financial conflict of interest). A conflict of interest, standing alone, does not warrant a finding that the administrator abused its discretion. *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 581–82 (8th Cir. 2014). When an administrator has "taken active steps to reduce potential bias and to promote accuracy," the importance of a conflict of interest is "less important (perhaps to the vanishing point) . . . ." *Glenn*, 554 U.S. at 117.

8

Here, the Court considers the alleged procedural irregularities identified by Plaintiff.  It also considers Hartford's process in reaching its decision regarding Verschelden, including independent review by an uninterested physician, reliance on Verschelden's own treating physicians, and independent review from the initial decisionmakers upon appeal.  After this analysis, the Court finds that Hartford's conflict of interest, in light of the other factors leading to its decision, does not justify the imposition of a heightened standard of review.

## B.      There are no egregious procedural irregularities.

A court may apply a less deferential standard of review where a claimant can show a procedural irregularity "so egregious that it might create a total lack of faith in the integrity of the decision making process."  *Hillery v. Met. Life Ins. Co.*, 453 F.3d 1087, 1090 (8th Cir. 2006) (internal citation omitted).  Plaintiff urges the Court to apply this heightened standard here, claiming egregious procedural irregularities plague the record, including:  (1) evaluating and denying Plaintiff's claim under the wrong definition of disability and failing to give Plaintiff an opportunity to appeal the claim under the correct definition; (2) changing the reason for denial between the initial and final denials, again without allowing Plaintiff an opportunity to respond; (3) failing to conduct a vocational evaluation prior to terminating benefits; and (4) seeking updated medical records before conducting review but failing to consider those records during the appeals review (Doc. 36 at 32).  These arguments are unavailing.

### 1.  Hartford did not initially evaluate and deny Plaintiff's claim under the wrong definition of disability.

First, Plaintiff claims a procedural irregularity occurred when Hartford initially denied Verschelden's claim because he could not perform "any *work*" despite the definition of Disabled requiring the inability to perform "any *occupation*" (Doc. 36 at 33) (emphasis added).  In its letter dated July 24, 2017, Hartford denied Verschelden LWOP provision benefits because "[t]he

restrictions indicated by your physician . . . would not continue to prevent you from performing *any work* as indicated in the policy definition of Disabled from a physical condition" (Doc. 30-5 at 79) (emphasis added). The letter also included the definition of Disabled from the LWOP provision.

After Verschelden's appeal, Hartford, in its final letter dated May 11, 2018, upheld its decision to terminate his life-insurance policy, and informed Verschelden it terminated his benefits because he was "not prevented by injury or sickness from performing the material and substantial duties of *any occupation* as of 07/24/2017" (Doc. 30-5 at 21) (emphasis added).

The language differentiation between the initial and final letters, Plaintiff asserts, shows both that Hartford initially used the wrong definition and that Verschelden had no opportunity to appeal the decision under the appropriate standard.

Hartford denies that it applied an incorrect definition when it first denied Verschelden's claim. It contends that in its initial letter, it quoted the correct definition of "Disabled" under the LWOP provision. Moreover, Hartford disagrees that there is any meaningful distinction between the use of "work" and "occupation" that could lead to error, and it notes that other courts have used the terms interchangeably, including in the ERISA context. Finally, Hartford claims that even if there were an error, any error was corrected and resolved through its internal appeals process.

Plaintiff filed six pages of Hartford's Group Benefit Claims Excellence Guidelines ("Guidelines") (Doc. 43). These Guidelines show the term Disabled to have a "Standard" and "Non Standard" definition. *Id.* at 3. Here, the definition used for Disabled falls under the "Non Standard" definition because it includes the language "the material and substantial duties of any

occupation." *Id.*  Policies using this definition "should refer the file . . . for an Employability Analysis Review." *Id.*

Plaintiff argues that Hartford applied the wrong definition of Disabled to Verschelden's claim when it initially decided to terminate his LWOP provision benefits, and the record indicates this is the case (Doc. 31-2 at 70–71).  Because of this error, Hartford did not perform an EAR before its initial termination; only upon appeal did it conduct an EAR.  Nevertheless, Plaintiff concedes that under the applicable regulations at the time, "Hartford was not required to provide Mr. Verschelden with an opportunity to respond to its post-appeal generated evidence" (Doc. 44-1 at 13).

The Court finds that, while the initial letter used the word "work" and the final letter used the word "occupation," the terms as used in this context are synonymous.  *See, e.g.*, *LaSalle v. Mercantile Bancorporation, Inc. Long Term Disability Plan*, 498 F.3d 805 (8th Cir. 2007) (using "work" and "occupation" interchangeably in ERISA denial); *Sawiers v. Qwest Disability Servs., Inc.*, 413 F. Supp. 2d 1030 (D. Minn. 2006) (same).  Despite not following its Guidelines initially, Hartford provided the appropriate paragraphs in Verschelden's Policy to identify the definition it was applying and conducted an EAR on appeal.  While the language did change from "work" to "occupation" between the initial and final termination letters and Hartford failed to initially follow its Guidelines, this does not constitute a procedural irregularity, much less one that creates a total lack of faith in Hartford's decision-making process.

### 2.  Hartford did not change its reason for denying Verschelden's LWOP benefits between its initial and final termination letters.

Next, Plaintiff alleges Hartford changed the reason for Verschelden's denial from the initial to the final termination without allowing him a response to the final denial.  Initially, Hartford denied Verschelden's policy because he could perform "any work" (Doc. 30-5 at 79).  But the final

11

denial was due to his ability to perform "any occupation," which Hartford interpreted to include part-time sedentary work (Doc. 30-5 at 21). This final denial was error, according to Plaintiff, because the language for "Disabled" in the LWOP provision does not include the term "part-time."

The Court notes that the Policy contains a clause giving Hartford "full discretion and authority . . . to construe and interpret all terms and provisions of The Policy" (Doc. 30-1 at 32). "[A]ny occupation" is language in the Policy that would fall under this provision. Language granting discretionary authority is valid and only triggers an abuse-of-discretion review. *Bruch*, 489 U.S. at 113–14 (discussing that discretion-granting language is enforceable and triggers only an abuse-of-discretion review); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 839 (8th Cir. 2001) (same).

When a policy uses the phrase "any occupation" without distinguishing between full-time and part-time employment, the term is ambiguous as to the type of work it encompasses. *See Sloan v. Hartford Life & Acc. Ins. Co.*, 433 F. Supp. 2d 1037, 1049 (D.N.D. 2006) (finding "no distinction between full-time and part-time employment" in the plan's language makes the phrase "any occupation" ambiguous), *aff'd*, 475 F.3d 999 (8th Cir. 2007). When a phrase is ambiguous, courts must "interpret the terms of the plan by 'giving the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" *Adams v. Continental Cas. Co.*, 364 F.3d 952, 954 (8th Cir. 2004) (citing *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 789–90 (8th Cir. 2002)). When other interpretive methods fail to clarify the ambiguous phrase, as a last resort, courts should resolve ambiguities against the drafter. *See Bond v. Cerner Corp.*, 309 F.3d 1064, 1067–68 (8th Cir. 2002).

Here, the term "any occupation" is ambiguous as it does not state whether it encompasses only full-time work or includes part-time work. And while Hartford provides ample evidence that Verschelden understood the policy to encompass part-time work, the Court is instructed to consider what a reasonable person in the position of the participant—*not* the participant himself—would have understood the words to mean.

Two facts persuade the Court that "any occupation" includes those occupations that can be performed on a part-time basis. First, as noted above, the Policy gives Hartford "full discretion and authority . . . to construe and interpret all terms and provisions of The Policy" (Doc. 30-1 at 32). Under *Bruch*, this statement is unambiguous and enforceable, and thus applies to "any occupation". It is undisputed that Hartford interprets the phrase to encompass part-time work. Second, the use of "*any* occupation" suggests a broad interpretation. As the Eighth Circuit has noted, "we doubt any claimant could ever prove *all* occupations require full-time employment." *Bond*, 309 F.3d at 1067 (emphasis in original) (discussing whether part-time work constitutes "any occupation" in ERISA disability plan). Thus, interpreting the phrase to utterly preclude part-time occupations would be contrary to the use of "any" in the definition.

Moreover, while evidence of Verschelden's understanding is not persuasive in the context of a reasonable person in the position of a plan participant, it is instructive in addressing Plaintiff's second argument—that Verschelden was not able to address a changed reason for denial of benefits upon appeal. Hartford contends, and the record supports, that Verschelden understood he was denied both initially and finally because he was able to work on a part-time basis (Doc. 31-2 at 85 ("Hartford plainly assumed that I could not continue to be Disabled as defined in the Policy if I could return to work on a *part-time* basis" (emphasis in original))). Verschelden dedicated a portion of his argument on appeal to the construction of "any occupation," including his ability to

work on a part-time basis.  *Id.*  Therefore, the Court cannot conclude that Hartford changed its

rationale on appeal, because all parties clearly understood the initial denial to be based on

Verschelden's ability to work part-time, the same reason given for denial on appeal.

### 3. No egregious procedural irregularities surround Hartford's use of vocational evaluations.

Third, Plaintiff alleges Hartford erred by failing to conduct a vocational evaluation before

terminating Verschelden's benefits.  Then, when it conducted a vocational evaluation for the first

time on appeal, Verschelden was not provided an opportunity to respond.  Plaintiff argues both the

failure to initially conduct an EAR and the inability to respond are procedural irregularities.

Plaintiff points to *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874

F.2d 496 (8th Cir. 1989), to support her contention that a vocational evaluation was necessary.  In

*Gunderson*, there was insufficient medical evidence to support defendant's finding that the

plaintiff was no longer disabled.  *Id*. at 500.  Despite this lack of evidence, defendant never

performed a vocational evaluation, and instead, used the same medical record to both support a

finding that the plaintiff was and was not disabled.  *Id.*  In these circumstances, the Eighth Circuit

determined a vocational evaluation is necessary before a court can conclude substantial evidence

supports the decision to terminate benefits.  *Id*. at 499.

But *Gunderson* turns on different facts than those of this case.  Unlike *Gunderson*,

Hartford's decision to terminate benefits was based on changed medical evidence regarding

Verschelden's condition.  *See Johnston v. Prudential Ins. Co. of Am.*, 916 F.3d 712, 715 (8th Cir.

2019) (declining to adopt *Gunderson*'s "burden-shifting approach" when defendant had evidence

allowing a reassessment of prior medical records).  And the Eighth Circuit has routinely held that

vocational evaluations are not required where, as here, there is evidence supporting a defendant's

decision to terminate benefits.  *See, e.g.*, *id*. (finding no vocational evaluation needed when

14

"Prudential's changed decision was supported by new evidence"); *Brumm v. Bert Bell N.F.L. Retirement Plan*, 802 F. Supp. 258, 266–67 (W.D. Mo. 1992) ("This Court interprets the holding in *Gunderson* to have narrow application [because the] Court of Appeals did not hold that vocational experts are required in all benefit determinations"), *rev'd on other grounds*, 995 F.2d 1433 (8th Cir. 1993); *Potter v. Conn. Gen. Life Ins. Co.*, 901 F.2d 685, 686 (8th Cir. 1990) (finding "no need for the introduction of any testimony by a vocational expert as to the type of work Potter might be able to perform, as there might have been had the evidence been less conclusive") (citing *Gunderson* as an example of circumstances where the evidence was not conclusive).

Moreover, Plaintiff's argument that Verschelden had a right to respond to the vocational evaluation is without merit. *See* 29 C.F.R. § 2560.503-1 (giving claimant the right to "a full and fair review of the claim and the adverse benefit determination"); *Midgett*, 561 F.3d at 896 ("The amendments to § 2560.503-1 enacted in 2000 . . . indicate that the full and fair review to which a claimant is entitled . . . does not include reviewing and rebutting, prior to a determination on appeal, the opinions of peer reviewers solicited on that same level of appeal."). Therefore, the Court finds that Hartford gave Verschelden a full and fair review upon appeal despite his inability to respond to the EAR.

Hartford's use of the EAR is not a procedural irregularity creating a total lack of faith in its decision-making process and triggering a heightened standard of review.

### 4. Hartford did not err in failing to consider Verschelden's medical records after July 24, 2017.

Finally, Plaintiff claims that Hartford erred by failing to consider Verschelden's medical records after July 24, 2017,—the date it terminated his benefits—despite seeking to collect them. Hartford clarifies that it sought all medical records Verschelden used to support his request for continuation of benefits, but that any records beyond the termination date were irrelevant since it

was Verschelden's burden to prove he was disabled on the date of termination to retain coverage under the LWOP provision.

Indeed, the Policy specifies that the LWOP provision applies only "while You are Disabled" (Doc. 30-1 at 58). Thus, because Hartford reasonably determined Verschelden was not Disabled starting July 24, 2017, that is the relevant date upon which Verschelden was required to show his continuing disability. The Policy expressly states that the LWOP provision applies only so long as Verschelden meets the definition of Disabled (Doc. 30-4 at 58–59). In other words, Verschelden's medical records after the termination date are irrelevant given that no benefits were payable for any new or worsening conditions because Verschelden was not continuously disabled. Accordingly, Hartford did not commit a procedural irregularity by considering Verschelden's medical records that determined whether Verschelden was disabled on July 24, 2017.

Thus, the Court finds that a heightened standard of review is not appropriate in this case.

**II.     Substantial evidence supports Hartford's decision.**

Applying the abuse-of-discretion standard, the Court may not overturn Hartford's decision if it is supported by substantial evidence, even if a different, reasonable decision could have been made. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997) (citations omitted). Substantial evidence is evidence that a "reasonable mind might accept as adequate to support a conclusion." *River*, 646 F.3d at 1033 (internal citation omitted). This only means that a reasonable person "*could* have reached a similar decision . . . not that a reasonable person *would* have reached that decision." *Midgett*, 561 F.3d at 897 (emphasis in original) (citation omitted).

In the present case, although there is substantial evidence that would support a decision to continue LWOP benefits, Hartford's decision to deny LWOP benefits to Verschelden is supported by substantial evidence. Again, the question is not would the Court have made the same decision as Hartford, but it finds the decision can be supported by substantial evidence.

16

First, medical records from three doctors who examined and treated Verschelden—Sarah Taylor, M.D.; Peirong Yu, M.D.; and Christine Boutwell, M.D.—support that Verschelden's health was improving on July 24, 2017, such that he no longer met the definition of Disabled. Dr. Taylor's treatment notes from April of 2016 reported that Verschelden was "doing well and without complaint" (Doc. 31-5 at 79). Dr. Taylor opined Verschelden was fully active and "able to carry on all pre-disease performance without restriction." *Id*. at 80. Medical scans confirmed that Verschelden remained cancer free. *Id*. at 91–96. In February 2017, Dr. Taylor filled out an Attending Physician's Statement—Progress Report for Hartford, opining that he could sit, stand, and walk for up to three hours at one time; bend at waist, kneel/crouch, drive, and lift up to ten pounds occasionally. She maintained these restrictions in her July 2017 assessment, not including additional restrictions which would indicate his condition had deteriorated (Doc. 31-2 at 153). Although Dr. Taylor found Verschelden unable to work for the remainder of 2016; *id.* at 83–89, 117; and concluded in her February 2017 report that he was "permanently disabled;" *id.* at 111; her treatment notes nonetheless support a conclusion that Verschelden's health was improving during the period leading up to July 2017.

Also in February 2017, neurologist Dr. Boutwell evaluated Verschelden. She noted Verschelden was "well-developed" with "fluent and appropriate speech" (Doc. 31-3 at 9).

The next month surgeon Dr. Yu saw Verschelden for a scalp and skull reconstruction surgery. Dr. Yu noted Verschelden was "alert, oriented, in no acute distress, . . . Speech without distortion. . . . Ambulating without assistance." *Id.* at 21, 25, 34. When Susan Boutte, N.P., reviewed Verschelden's symptoms, she found he was "positive for bilateral hearing loss, . . . [but] without complaints of headache, pain, gait changes, recent falls, vision changes, speech or swallowing changes, focal weakness, new numbness, tingling, interim seizure activity, bowel or

bladder changes, appetite difficulty, memory changes, or fatigue" (Doc. 31-3 at 30). She reported his speech was "clear and fluent" and hearing was sufficient for conversation. *Id.*

These medical records support Hartford's decision to terminate Verschelden's LWOP benefits because a reasonable person, evaluating the evidence, could conclude he was not prevented from "all occupational functioning."

Second, neurologist Michael Snyder, M.D., who conducted an independent medical review of Verschelden's file, concluded that he could perform some part-time work. Dr. Snyder reviewed Verschelden's record of fatigue and considered Verschelden's "consistently reported chronic fatigue" when assessing his restrictions and limitations (Doc. 31-1 at 41). Indeed, he explicitly clarified that working more than part-time, up to four hours per day and up to twenty hours per week, "would likely be very difficult for this patent to tolerate" and that any work would necessitate "seizure precautions." *Id.* at 41–42.

This independent medical review also supports Hartford's denial of benefits. Any conflict between the medical opinion of Dr. Snyder and the opinions of Verschelden's treating physicians is minimal, and the record shows that Dr. Snyder considered the opinions and findings of Verschelden's treating physicians when formulating his own opinion as to the extent of Verschelden's disability. Further, even "[w]here the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled." *Delta Family-Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834,843 (8th Cir. 2001). It is also not error for a plan administrator to give the opinions of its own expert more weight than the opinions of treating physicians. *Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 806 (8th Cir. 2014).

Finally, the amended EAR supports Hartford's decision. The amended EAR used the limitations identified by Dr. Snyder restricting Verschelden to work that could be completed on a part-time basis ("up to 4 hours/day, up to 20 hours/week") and was of a sedentary nature (Doc. 30-6 at 128). It also imposed additional restrictions due to Verschelden's potential for suffering from seizures. *Id.* These restrictions were arguably more conservative than the restrictions suggested by Dr. Taylor, Verschelden's treating physician (*see* Doc. 31-2 at 111, 153). After reanalyzing Verschelden's work capacity under these added restrictions and limitations, Hartford still determined Verschelden was capable of working in four positions: appointment clerk, referral and information aide, diet clerk, and animal shelter clerk (Doc. 30-6 at 129).

Plaintiff's argument that Hartford failed to consider Verschelden's "non-exertional aspects of working" and the actual duties of the identified occupations (Doc. 38 at 33), is without merit. First, Hartford incorporated into its amended EAR Dr. Snyder's recommendations, including limitations based on Verschelden's potential for seizures and fatigue (Doc. 30-6 at 128–29). Moreover, the record clearly reflects that Hartford considered the actual duties of the identified occupations. *Id*. at 128–44 (showing consideration of Verschelden's ability to perform a variety of tasks and the specific tasks required by the four positions identified).

Collectively, the above constitutes substantial evidence supporting Hartford's decision that Verschelden was not disabled (as defined by the Policy) on July 24, 2017, because he could perform other part-time work. Thus, Hartford's decision to deny LWOP benefits was not an abuse of discretion.

## Conclusion

For the reasons discussed above, Hartford's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.

**IT IS SO ORDERED.**

Date:   September 4, 2020                        /s/ Greg Kays
                                        GREG KAYS, JUDGE
                                        UNITED STATES DISTRICT COURT